Valle v. Ceres Environmental Services. Good morning, Mr. Sanchez. Good morning, Your Honor. Good morning. May it please the Court, Anthony Sanchez on behalf of the plaintiff's appellants in this case in an FLSA case in which they're seeking, they're asking the Court to reverse an omnibus order which denied their motion for summary judgment and granted the defendant's motion for summary judgment. Counsel, I'm sorry, can you just lift the microphone up a little bit, please? Thank you so much. We're asking that the Court reverse the omnibus order that denied the plaintiff's motion for summary judgment and granted the defendant's motion for summary judgment on the basis that there was no questions of fact and relying upon an incorrect legal standard which the Court applied by relying on a regulation which had already been judicially vacated in accordance with the administrative procedures. I agree that it was an error to be using that, but tell me this. Has the judgment against AA and K and Alfred Miller been satisfied? It has not. Okay. All right. If you take that regulation you referred to, set it aside, look at the eight-factor test, how would you reach any different result? Seems to me you end up in the same place. I disagree, Judge. I think that what the District Court did was that he applied, by applying the standard, is that he looked at the eight factors with a view towards how they affect control rather than how they affect the economic dependence of the plaintiffs on the employer in this case, which is what the standard requires. In looking at the issue of control, one of the things that's curious about this case is that the court, the District Court even found that the plaintiff established certain portions of control and supervision. He said, therefore, the plaintiff only established that this . . . We're looking at it de novo. It seems to me Srez didn't exert more than a minimal degree of control. When we're looking at the issue of control, we have to look at it from the perspective of how the control reflects upon the economic realities. The economic realities of the case is that the only employer that existed at the time that this hurricane struck the panhandle was Ceres Environmental Services, that all of these other employers are a part of its network as it announces on its own website that they bring to the job site to do this work. The amount of . . . General contractors hire subs all the time. That doesn't make them the employer, the joint employer. No, but under the contract, the general contract between Serez and the government agency, they were required and they had the right and it was contemplated that they would be able to pay directly all of the people that provided the work, that they would be able to pay them directly under the terms of the contract. The contract also provided that Serez Environmental Services and any contractor that it brought into the thing was going to be responsible for and was promising that they would pay in accordance with all of the applicable labor laws. This is a contract that the government gives an agency premised on the idea that the person that they are . . . that the entity that they're bringing to this job site is going to pay the people that actually do the work. They had a contractual and a statutory obligation to do the work. I thought that workers negotiated their pay with AA and K and received their pay from AA. They . . . well, if they had received their pay, obviously, we wouldn't have to be here. Actually, that brings up another question related to that, which is I thought that you all had settled with AA and K and Miller. Did I misunderstand? No, that is not correct, Your Honor. What happened was as this order on summary judgment was entered a long time ago and we couldn't immediately appeal it because it only disposed of the claims of two of the appellees or two of the defendant employers in this case. The other one remained open. The case wasn't final. That order wasn't final until the remaining employee not wanting to go to trial, not wanting to go to the expense of trial, made an offer of judgment for the full amount at issue and we accepted that. So, we have a judgment in favor of . . . But your state hasn't been paid. No, no. They've been paid absolutely nothing. They've been paid absolutely nothing. Can I ask you a question about the eight-factor test? So, the eight-factor test comes from our decision in Leighton and in Leighton we cite the regulation that was in place at the time. Yes. That regulation doesn't exist anymore. That was like two regulations ago. Do we have to follow Leighton? Do we need to apply that eight-factor test? Is there a test that we have to apply? Well, I think if Leighton still exists and it does, it applied the regulation and it made the eight-factor test and now . . . But the regulation doesn't exist anymore, right? The regulation . . . Am I right about that? I mean, just factually. I don't . . . You know, that's an interesting question, Judge, and I don't know how to answer it exactly because there was a regulation and then the regulation that was vacated, the one that the district court relied upon in this case was basically a substitute and what it purported to do was to change the focus of the analysis from whether or not the plaintiffs are economically dependent upon the employer to whether or not there's administrative control and supervision. So, you know, when . . . Let me ask you a question about something that Judge Pryor said. So, with respect to the district court relying on the vacated regulation, why is it in your view that the ruling of a district court in New York could control the law that would be applied by a district court in Florida? Well, we covered that extensively in our reply brief and the reason is that the Administrative Procedures Act, which is an act of Congress, empowers and directs district courts to do exactly that. So, it's a legislative decision that puts the power in the federal courts to vacate administrative publications which are arbitrary and capricious. Does it matter because since then, the regulation has been rescinded by the agency, hasn't it? It was rescinded by the agency, so every part of what the district court did in this case was promised upon applying a standard that is different than the one that controls. The Layton standard still controls. And why does it still control? I guess if the law that Layton was applying doesn't exist anymore, the regulation that Layton was applying doesn't exist anymore, why would Layton control? The statute existed when Layton was determined and it was applying the statute to the law. The regulation that has been recently rescinded, what it did was it essentially took out the definition of employer under the Fair Labor Standards Act and created a second definition which is not statutorily based at all. Whereas under the Fair Labor Standards Act, anyone who suffers and permits someone to work is an employer. This regulation in the district court's decision purported to create a separate standard than the Layton standard for joint employment. It's well settled under the Fair Labor Standards Act that employees can be employed by more than one employer at the same time. And the fact that it creates one statutory definition for the word employer, which is to suffer and permit, and now this regulation and this decision purports to create a separate standard for joint employment, a second tier of employer is just a completely different and a misapplication of the law. Can you help me with something? The regulation that's been rescinded was a regulation as I understand it that took effect in 2020 on March 16th. Her Layton decision is from 2014. So the eight factor test from Layton wasn't based on the regulation that has since been rescinded. Your Honor, the regulation that was rescinded was a rewriting of the regulation that existed when Layton was in place. I see. So the regulation as it was numbered did in fact exist. And this Honorable Court applied the facts and the law looking at that regulation. So maybe you don't know the answer to this, but when the regulation, the 2020 regulation was rescinded, are we living in a world where there are no regulations? Are we living in a world where the rescension of the regulation from 2020 somehow reverted back to the regulation that led to our ruling in Layton? Respectfully, Judge, I don't think I'm smart enough to figure that one out. I just don't know. Well, I would think that if they've rescinded the regulation entirely, then there's just not a regulation in place anymore. But there's still Layton, which applied the Fair Labor Standards Act, in fact, and created this standard. Yeah, but I got to tell you, though, when I read Layton, though, I mean, we seem pretty clear in Layton that we are applying that regulation that existed at the time. I mean, maybe I'm wrong about that, but that this is the genesis of my question. Maybe. Well, if they were applying, it's just a regulation, it's guidance. It's not law that they apply, it's guidance. And they can take that guidance, and if that guidance changes, it doesn't change the existence of controlling authority. Well, let's just assume, I guess, that we're under the eight-factor test. So what is your, it seems like if this is a case with joint employer, then really any contractor-subcontractor relationship is one where there's a joint employer. What stands out about this relationship that you think sort of takes it out of the sort of normal realm of contractors and subcontractors? That's a good question, because one of the things that Layton says is that you have to look at the totality of the circumstances. And the nature of this industry is that the people that do the work aren't full-time employed. Hurricane hits, that's when they become employers. These corporations, the ones that are ostensibly the employer, the A, A, and K, the shell that was created after the hurricane hit, these were not employees of anyone. They don't employ anyone anymore. That company has never deposited any check that wasn't related to this case. And they didn't pay the plaintiffs in this case. So what was your answer to my question? I'm sorry, could you repeat? So what is it that, in your view, sort of takes this relationship and makes it not a normal contractor-subcontractor sort of relationship and says, no, under this eight-factor test in Layton, this is different. This is a joint employer relationship and not a normal job. The difference is that the work is emergent. These people aren't working as disaster relief people at the time that the hurricane hits. They are recruited. They are brought here by the only company that has the wherewithal to pay them. A, A, and K didn't exist when the hurricane hit. Maybe that would be helpful to know, right? If A, A, and K didn't exist when the hurricane hit, I understood this to say that Ceres had contracted with several subcontractors to do the cleanup work. And you're saying that these weren't pre-existing relationships and that after the hurricane hit, Ceres went out and advertised for people who would be subcontractors who would then Is that how this worked? Yes. Ceres holds itself out as the world's largest disaster recovery group with the ability to both self-perform work immediately and engage a network of thousands of subcontracting partners. Right, but that to me, when I read through that, I thought that suggested that they had a pre-existing relationship with a network and then the network could bring in people as needed. But the network is just people. It's not like ERG existed at the time. There was a woman who was a principal of ERG, but ERG didn't even exist. When they entered into this master subcontract with Ceres, the corporation didn't even exist. It was just a person. They actually signed the contract under a different corporate name than they ultimately incorporated. And they actually signed the contract under a corporate name that was owned by another entity. They don't even know their own name. They're just people, and they're bringing people on an emergency basis to do important work that's necessary in a public interest. It's a public service, and it's funded by the public. It's federal money. Ceres is the spigot through which all of this money and all of this public service is made possible. You were answering a question from Judge Rosenbaum. You saved three minutes for rebuttal, so let's hear from Mr. Rosenbaum. Thank you, Your Honors. May it please the Court. Appellants in this case are seeking an unprecedented expansion of . . . Let's resolve a preliminary matter. Do you have any reason to doubt that his representation judgment against A&K has been paid? I'm unable to speak to that, Your Honor, because it's not part of the record. Okay. Right. So as far as we're concerned, it's not moved. Go ahead. That's correct, Your Honor. The appellants are seeking an expansion of liability under the FLSA that would have a one that extends far beyond the boundaries established by this Court's decision in Leighton v. DHL. What about what Judge Pressure has asked about Leighton? Leighton, in developing an eight-factor test, relied upon a regulation that apparently now no longer exists. I also can't speak to that fact, but what I do know, Your Honor, is that this Court in Leighton was relying on the FLSA, which still does exist. Yeah. So, I mean, in Leighton . . . and, you know, this may not matter, but, I mean, in Leighton, we talk about this regulation and we cite . . . we actually quote the regulation extensively. Do you know . . . I mean, do you just know as a factual matter whether the recension of the 2020 rule left some other regulation in place or whether it just left nothing in place to define a joint employer relationship? I don't believe it did, Your Honor. Instead, what I think happened after the rule was rescinded is that the precedent as established by Leighton remained and that was a decision that was based on the FLSA, which still remains. So, I think that Leighton does control and those factors, I think, were applied in this case. Appellants argue that the DOL guidance was inappropriately relied on, but I do take issue with that. I don't think that the district court relied on the DOL's guidance. I think the district court made that clear on two occasions, actually, page nine of the omnibus order, that it was, in fact, relying on this circuit's multi-factor test as established by Leighton as supplemented by the DOL's guidance. This court may be concerned with what does supplementation mean and, really, the district court looked to exclusively where the two overlapped. The DOL's guidance, for example, has four factors. Control and supervision, which is in the Leighton multi-factor test. Hiring, which is in the Leighton multi-factor test. Negotiation of payment rates and methods, which is in the Leighton multi-factor test. The fourth factor of the DOL's guidance, which has since been rescinded, that is not in the Leighton multi-factor test is whether employment records exist. The district court, however, made expressly clear in its order that it was not going to even discuss that fourth factor of employment records. That leaves only one distinction between the two, and that is that the DOL's guidance at that time looked to whether or not the putative employer exercised actual control. That too, however, is something that the district court did not discuss. Removing those two differences between the DOL's guidance and the Leighton multi-factor test left only this overlap, and that is exactly what the court discussed. The court proceeded to then go through the multi-factor test and recognize that the evidence overwhelmingly, quote, established that Sears was not appellant's putative employer or joint employer. Let me ask you a question, though. Going back to Judge Brasher's question, if there's not really a regulation, why wouldn't we just go, I mean, we'd have to anyway, go to the, instead of looking to Leighton, why wouldn't we just go to the statutory language, the definitions that are set forth, and what we've said about those definitions in the past, and go from there? Well, Your Honor, I think that would bring this court into the same position that it was in Leighton, and Amable, and Antonor, and Martinez-Mendoza, when it was, in fact, weighing these factors under the statutory language as articulated in the FLSA, so I don't think that the outcome would be any different. And we've said, well, except that as you've just discussed, and as Judge Brasher's mentioned, in Leighton, we were talking about the factors that had been set forth in the regulation to a large extent, right? Partially, Your Honor. That's what I said, to a large extent. Right. The first five factors are the regulatory factors. The latter three factors are non-regulatory factors that were primarily developed through this case, this court's decision in Amable. So those factors were, nevertheless, derived from the FLSA, which is still in place today. And those factors look to basic common-sense indications of joint employment. Did the putative employer control the worker, supervise them, hire them, negotiate with them? Although in the past, it seems like our jurisprudence has always focused more, I mean, it's focused on control to a certain extent, but with sort of the major framing of it being whether, as a matter of economic reality, the individual was dependent on the entity. I mean, wasn't that really sort of the more overall frame of how we were looking at these things? That's correct, Your Honor. And that's something that the district court did discuss in the order. It's important to remember that despite appellant's argument that economic dependence was not discussed or analyzed. But even so, I mean, when we look at this, first of all, you all have, I think you've all taken the position that we review this de novo, right? That's correct, Your Honor. Okay. So, I mean, it's always, we always like to see what the district court said because the analysis can be helpful to us, but in the end, we have to review it ourselves anyway. So we've also said that this definition is intended to be among the broadest kinds of definitions for employment that's ever been written, right? And it stemmed from the problem where people, entities were using middlemen to employ child laborers, right? And so don't we have to sort of keep that in mind when we're looking at the overall framing of whether as a matter of economic reality, the individual is dependent on the entity? That's absolutely right, Your Honor. This is a broad test. However, it is not a limitless test. What appellants are advocating for is a test that essentially has no limits, no limiting factor. As Judge Brasher pointed out, where does it stop? That's the issue. The same arguments that appellants make that applies to series could equally apply to the Jackson County Board of County Commissioners through whom the money flowed, who received a benefit of the appellant's work, who had some degree of involvement in this work. That same argument could then be made about the state of Florida. That same argument could be made about FEMA and could be made about the United States. Any argument that applies to series applies to those parties as well. But surely that's an absurd result that should not be blessed by this court. There needs to be some limiting factor. And right now there is. There's some reasonableness that needs to be considered. And that is a standard that was established by Layton versus amiable Martinez-Mendoza. All these cases provided a limiting factor. That's what I'm trying to get at, though. And I understand there are all these factors, although it's not entirely clear, I think, at this point, what factors we consider in view of the fact that there appears to be no regulation and Layton derived at least five of the factors from the regulation. But we know this definition is broad. We know that it's focused on whether, as a matter of economic reality, the individual is dependent on the entity. How do we account for that in the definition without, I mean, like, how would you account for that? Because the problem I'm seeing is that you both have the same problem. It's just different ends of it, right? Under your definition, everyone, or under the way you view the definition of your friend on the other side, everyone would qualify. Under his definition of how he views your way of looking at it, no one would qualify except the immediate employer. And so I guess I'm looking to you as to what you would say are the ways that we would sort this out that will not always result in the fact that there is a general contractor-subcontractor relationship, meaning that there either is or is not a joint employer relationship. Do you understand what I mean? I think I do, Your Honor. And the problem that I think you've described is a problem that's present in any consideration of the totality of the circumstances. There is no mathematical formula. There's always going to be some degree of uncertainty, and that deference is given to the trial court, or in this case, this court. Well, how is that if it's de novo review? Under this court's de novo review, this court can, too, look at the totality of circumstances after weighing these factors. Right, but I'm saying you said there's deference given. I'm sorry. By the trial court. The trial court assesses these eight factors, and then with the evidence before it, looks at the totality of the circumstances. This is summary judgment. There's no deference, is there? No. No, Your Honor. No, I mean, this is de novo review. It applies . . . Let's assume that the rescinding of the regulation does not abrogate Layton, which is, I think, to say that the rescission of the regulation means that Layton is no longer controlling, we'd have to say that it has effectively abrogated our precedent. I'm not sure we can do that. So, if Layton does control, then we have a record of undisputed facts. Both sides agree that the facts are, I think, the material facts are undisputed. It's just what conclusion you draw from them, right? That's correct, Your Honor. And so, we apply, if Layton controls, we apply those eight factors to determine de novo, whether the control was sufficient for your client to be considered a joint employer, right? That's right, Your Honor. And it strikes a balance between everyone being covered, as he says your argument would result in, and your argument that no one would be excluded from joint employer status. We apply the eight factors, which our precedent says strikes the balance. That's correct, Your Honor. And I think, as you referred to, that these facts are undisputed, and it can be, on de novo review, this test can be readily applied to the facts and reach the same exact outcome. I think that, actually, the Second Circuit, in Zang versus Fashion Apparel, made a particularly relevant observation when it said that the Fair Labor Standards Act was not intended to subsume the typical outsourcing relationship, nor was it intended to bring normal, strategically oriented contracting teams within the ambit of the FLSA. And that's really what this comes down to. This is a unique case in that all the FLSA cases that I was able to identify related to three parties. This is a four-party matter. A subcontract series contracted entered its own contract with ERG, who hired A, A, and K, who then entered into subcontracts with appellants. This is a typical outsourcing relationship that is necessary to do this work. Can I ask you a question about one of the things that your friend on the other side mentioned, the provision in the contract that says something to the effect of, if the employees are not paid, we have the right to pay them. Why is that in the contract? What does that mean for purposes of the eight-factor test, if anything? Could you just address that issue? Sure. First of all, that's standard language in any kind of multi-level contract, whether it relates to construction or to disaster relief, it's standard. It doesn't matter in this case because that authority was never exercised. It's not a factor on its own, but one of the factors is actual payment. Not who had the ability to pay the workers, anyone in this room could have paid the workers, but who actually paid the workers, and that fact is undisputed. A, A, and K paid the workers. Series never had the opportunity to pay the workers. I guess, so why, you say that's a standard, you know, I learn something new every day. So why is that in one of these, why is that standard language where the general contractor, let's just say it's a general contractor, wants the right or opportunity to pay unpaid employees of a subcontractor? Practically speaking, it's to avoid this exact situation. However, these workers never came to series. The workers testified they didn't know who series was. They didn't know series existed. So series was never presented with the opportunity to settle this long in advance of this matter. Your honors, the second issue that I would like to briefly address, I see my time is almost up, is the second count that's against series that was also decided on summary judgment, and that is the breach of agreement to pay wages. I would ask that this, if you really didn't deal with that in opening at all, but go ahead. Thank you, your honor. I just wanted to point out that we do believe that the district court was correct. Appellants have conceded the fact that there is no express contract between them and series. In turn, they're relying only on this theory of implied in fact contract. Under Florida law, to have a contract implied in fact, there must be some conduct between the parties that amounts to an implicit promise. In this case, there was no conduct between the parties. Appellants themselves have made that clear. They didn't know who series was. They didn't know series existed. That's that this court affirmed this decision. Thank you. Thank you. Mr. Sanchez, you've saved three minutes. I would like to point out that the provision in the contract is important because it reflects the control that series has over the job site. It's a reflection of control, which the revised regulation, the one that has since been rescinded, said didn't have to be considered. So where the controlling standard requires that you consider a totality of the circumstances, including the right and the obligation to comply with federal statutes, that was not considered because this regulation took it out of consideration. Let me ask you something about that. Then, in every case where that provision exists in the contract, would it be a joint employer situation? No, Your Honor, but it would be . . . So then what makes it a joint employer situation here in your view? One of the things that we have to look at is the fact that, first of all, I want to see the district court apply a different and an incorrect standard. Here's the problem, right? We have to figure out whether this is a joint employer situation or not a joint employer situation. Speaking for myself, I do not want to lay down a rule where every subcontractor, general contractor relationship is a joint employer situation, nor do I want to lay down a rule where none of them are. I'm asking you for help in identifying . . . I realize we apply the factors, but there must be some factors here that you think particularly require this conclusion that are not in existence in other relationships between general contractors and subcontractors. I'm asking you to identify what you think those things are. Let's start with what the district court did find. It found that the ownership of the location in this case belonged to Ceres because they had complete control over access to the job site. They didn't own it though. I'm sorry? They didn't own the work site. No, they didn't, but they essentially leased it from the county government. I thought they were cleaning up just like public areas. They're cleaning up public areas, but people can't just come in there and start cleaning up public areas. The county had to cede them that right. They gave to Ceres the right exclusively to suffer . . . It had some control over the work site, right? Let's be fair about this. It didn't own the facilities where the work occurred. It had some control over the work site, right? Well, they were the ones that let people into the work site to do the job. No one else could do that. They did that. They suffered and permitted these plaintiffs to do the work, this public service. Not only that, but the district court found that the job that the plaintiffs were doing was intimately integrated, done side-by-side with workers directly employed by Ceres. That was the seventh factor. It found the sixth factor in favor of the plaintiffs. It found the seventh factor in favor of the plaintiffs. All of the factors that go to economic dependence, they found in favor of the plaintiffs. They completely ignored . . . I say they, I mean the district court completely ignored the eighth factor, which is the relative investment of the employer because that one also goes to economic dependence. The reality is that the A, A, and K was completely uncapitalized. Its capitalization is its proximity or its connection. The bobcats that were used by the workers, who were they on that? Those were leased. Those were leased. They weren't Ceres, were they? Well, Ceres had to put a placard on them with their name on it saying that this They didn't belong to them, did they? Didn't belong to the plaintiffs. And they didn't lease them either, right? Ceres didn't. No, they didn't. But they were the ones that controlled whether or not they were good enough to come on the job site, and they put a placard on them. The plaintiffs' names appear on time records that have the logo Ceres on them, and they appear as ERG employees. The Ceres suffered and permitted them to work. And that's how you define who an employer is under the Fair Labor Standards Act. They're the only ones that could, and they're the only ones that did suffer and permit the plaintiffs to work, and that's why. Mr. Sanchez, we let you go over both in your opening and in your rebuttal, but you are answering questions from us, and we thank you for your argument. Thank you, Judge. We'll move to the next case.